IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CT-3294-FL

JENNIFER ANN JASMAINE f/k/a      )
DUANE LeROY FOX,                  )
                                  )
            Plaintiff,            )
                                  )          ORDER
      v.                          )
                                  )
MR. FUTRELLE, A. DAUGHETY, DR.    )
ELIZABETH BYRD, DR. OWENS, MS.    )
HACKET, and MR. DANILES,          )
                                  )
            Defendants.           )

The matter is before the court upon plaintiff's "motion to participate in the WDNC pro se

settlement assistance program" (DE 166) and the parties' cross-motions for summary judgment

pursuant to Federal Rule of Civil Procedure 56 (DE 128, 143, 151). The motions have been fully

briefed and thus the issues are ripe for decision.

## STATEMENT OF THE CASE

On November 12, 2015, plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 and the

Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1, in which

she[1] alleged that defendants were violating her religious rights and were also deliberately indifferent

to her serious medical needs. After filing her complaint, plaintiff submitted numerous motions,

---

[1] Plaintiff refers to herself using female pronouns "she" and "her". Accordingly, the court also refers to plaintiff using such pronouns, except to the extent it quotes records that do otherwise.

including: (1) a motion for appointment of counsel (DE 4); (2) a motion requesting discovery (DE 5); and (3) two motions seeking the entry of a preliminary injunction (DE 8, 11).

On December 15, 2015, the court denied plaintiff's motions and conducted a frivolity review (DE 14). At frivolity review, the court dismissed several John Doe defendants. (Id.). However, plaintiff was permitted to proceed with her First Amendment, RLUIPA, and deliberate indifference claims against the remaining defendants. (Id.).

Plaintiff appealed the order denying her appointment of counsel (DE 17, 20). During the pendency of her interlocutory appeal, plaintiff filed two motions to amend her complaint (DE 16, 24) and twice renewed her request for the entry of a preliminary injunction (DE 25, 28).

On March 1, 2016, the court allowed plaintiff's first motion to amend as a matter of course (DE 48). Her second motion to amend was allowed in part and denied in part. (Id.). Specifically, plaintiff was permitted to proceed with an additional deliberate indifference claim against Clarence O. Ellis. (Id.). In all other respects, plaintiff's second motion to amend was denied because her proposed amendments were futile. (Id.). After addressing plaintiff's motions to amend, the court denied plaintiff's motions for the entry of a preliminary injunction. (Id.).

Just a few days later, plaintiff filed her third motion to amend (DE 51). This was soon followed by a fourth motion to amend (DE 60), a renewed motion for the entry of a preliminary injunction (DE 57), and renewed motion for the production of discovery (DE 63). In addition, plaintiff submitted several other documents with the court, all of which either sought further immediate injunctive relief (DE 59, 64, 69, 70) or otherwise elaborated on her claims (DE 58).

The Fourth Circuit dismissed plaintiff's interlocutory appeal on March 28, 2016 for failure to prosecute (DE 66). This court addressed plaintiff's pending motions on May 20, 2016 (DE 89).

First, the court noted that plaintiff's allegations were now strewn throughout numerous docket entries. (Id.). In her filings, plaintiff often listed the names of individuals without specifically alleging their personal involvement or describing how their conduct injured her. (Id.). For these reasons, the court determined that plaintiff's allegations no longer satisfied the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. (Id.). Accordingly, the court directed plaintiff to file a single amended complaint specifically stating the injury stemming from defendants' actions or inactions and the alleged facts to support her claim. (Id.). After directing plaintiff to particularize her claims, the court denied plaintiff's remaining motions. (Id.).

Before filing her particularized complaint, plaintiff filed a motion seeking miscellaneous injunctive relief (DE 95), which was denied (DE 96). After receiving an extension of time, plaintiff filed a timely particularized complaint (DE 99).

The court reviewed plaintiff's particularized complaint on March 2, 2017 (DE 108). First, the court noted that plaintiff had largely ignored the court's instructions regarding particularization. (Id.). Specifically, plaintiff continued to re-assert previously dismissed claims and a good portion of her claims still failed to comply with Rule 8. (Id.). Nonetheless, the court allowed plaintiff to proceed on: (1) her claim that defendants Futrelle, Owens, Byrd, Daughety, and Daniels were deliberately indifferent to her serious medical need of Gender Identity Disorder ("GID")[2]; and (2) her claim under RLUIPA and the First Amendment that defendants Hackett and Daniels violated her religious rights. (Id.). The court dismissed plaintiff's remaining claims as frivolous. (Id.). On

---

[2] GID is also known as Gender Dysphoria, and is a "a disorder characterized by a feeling of being trapped in a body of the wrong gender." De'Lonta v. Angelone, 330 F.3d 630, 631 (4th Cir. 2003).

March 17, 2017, plaintiff filed an interlocutory appeal, challenging the dismissal of several defendants, which was subsequently dismissed (DE 109, 135).

Byrd and Owens answered plaintiff's particularized complaint on March 21, 2017 (DE 112, 113). Defendants Daniels, Daughety, Futrelle, and Hackett answered on March 23, 2017 (DE 115). Plaintiff filed another motion requesting the appointment of counsel on April 6, 2017 (DE 117). On April 24, 2017, the court entered a case management order governing discovery and dispositive motions deadlines (DE 119). Thereafter, plaintiff filed a motion to compel discovery (DE 123), and also objected to defendants' discovery responses (DE 124, 125). Before the court ruled on her motion to compel, plaintiff filed a renewed request for discovery (DE 138).

Byrd and Owens filed a motion for summary judgment on September 28, 2017 (DE 128). In support of this motion, they filed a memorandum, a statement of material facts, and an appendix, which included: (1) Byrd's and Owens's affidavits; (2) plaintiff's prison movement record; (3) excerpts from the North Carolina Department of Public Safety's ("DPS") policy manual relating to the evaluation and management of gender dysphoria; (4) a memo drafted by a DPS review board discussing plaintiff's case; and (5) plaintiff's medical records. (DE 129, 130, 131, 132, 133).

On October 23, 2017, plaintiff responded to Byrd's and Owens's summary judgment motion (DE 142) and also filed her own cross-motion for summary judgment (DE 143). Plaintiff's cross-motion is not supported by any additional materials. Byrd and Owens responded to plaintiff's cross-motion (DE 145), and plaintiff replied (DE 149). Plaintiff's reply was supported by her own declarations and excerpts of her medical records duplicative of those already provided by Byrd and Owens.

On November 14, 2017, plaintiff moved to amend her complaint to add new defendants (DE 146). During the pendency of plaintiff's motion to amend, defendants Daniels, Daughety, Futrelle, and Hackett filed a motion for summary judgment (DE 151). This motion was supported by a memorandum, a statement of material facts, and an appendix, which included: (1) Daniels's affidavit; (2) DPS's policy on Gender Dysphoria; (3) DPS's policy on Wiccan religious observances; (4) Daughety's affidavit; (5) a grievance filed by plaintiff and DPS's response; (6) Hackett's affidavit; (7) plaintiff's request to engage in Wiccan religious activities; (8) an excerpt from a policy manual discussing DPS's standard operating procedure regarding inmate religious services; (9) another policy and procedures manual discussing religious services; (10) Futrelle's affidavit; (11) a memo summarizing the treatment recommendations made for plaintiff after a review panel considered her case; and (12) plaintiff's medical records. (DE 152, 153, 154).

On January 19, 2018 plaintiff filed a belated memorandum in support of her previous cross-motion for summary judgment (DE 158) and responded to Daniels's, Daughety's, Futrelle's, and Hackett's summary judgment motion (DE 159). Neither the memorandum nor the response was supported by any evidence other than plaintiff's allegations.

The court denied all of plaintiff's pending motions on March 14, 2018 (DE 163). In particular, her motion to amend was denied because her proposed amendments were untimely and futile. Even if her amendments had not been futile, the court determined plaintiff was given ample opportunity to amend her claims, and allowing her to amend her claim again at this late stage in the proceedings would be prejudicial to the defendants.

Finally, on May 9, 2018, plaintiff filed her "motion to participate in the WDNC pro se settlement assistance program" (DE 166). Defendants did not respond.

## STATEMENT OF UNDISPUTED FACTS

A.    Facts Related to Plaintiff's Deliberate Indifference Claim

Pursuant to DPS policy, when an inmate alleges or presents with symptoms of gender dysphoria, she undergoes mental and physical evaluations to determine the optimal plan of care. (Owens Aff. (DE 131) ¶ 7). This assessment includes a full physical examination, laboratory testing, psychological testing, and clinical interviews. (Id.). Past medical records are reviewed to assess whether an inmate has previously received hormone therapy or undergone surgical procedures. (Id.).

If a diagnosis of gender dysphoria is supported by this assessment, the inmate is referred to a Gender Dysphoria Review Panel ("GDRP"). (Id.). The GDRP will then develop recommendations to assist the inmate to successfully adapt to a prison environment. (Id.). Potential recommendations include: "referrals to mental health and primary care services, educational resources, possible hormone therapy or other treatment interventions, and the allowance or prohibition of items designed for masculinizing or feminizing effect." (Id.). Furthermore, if an inmate was prescribed hormone therapy prior to incarceration, the GDRP may refer the inmate to an endocrinologist. (Id.). Based on the findings of the endocrinologist, hormone therapy may be continued during incarceration. (Id.). Per DPS policy, health care providers who are not members of the GDRP are not permitted to enter treatment orders related to the management of alleged gender dysphoria symptoms. (Id.). Of the defendants named in plaintiff's deliberate indifference claim, only Daniels and Futrelle were members of the GDRP during the time relevant to plaintiff's complaint. (Id. ¶ 8).

Plaintiff was convicted of a sexual offense on July 11, 2014. See N.C. Dep't of Pub. Safety, Offender Pub. Info. On August 26, 2014, she was transferred to Harnett Correctional Institution ("Harnett"). (Id. ¶ 9). She was immediately referred to mental health services because she, *inter alia*, reported a history of hormone therapy prior to incarceration. (Id.). A physician assistant ("PA") examined plaintiff the next day. (Id.). During this examination, plaintiff repeated her assertion that she received hormone therapy. (Id.). However, she clarified that the hormones belonged to a friend because she could not afford them through a health care provider. (Id.). The PA noted that plaintiff had history of mental health issues, having been evaluated by Central Prison Mental health prior to her transfer to Harnett. (Id.). The PA explained DPS's policies regarding gender dysphoria to plaintiff, and then referred plaintiff to the GDRP. (Id.).

After her referral to the GDRP, plaintiff was evaluated by a psychologist or psychiatrist several occasions. (Id.). During these evaluations, plaintiff was diagnosed with, *inter alia*, gender dysphoria and transvestic disorder with autogynephilia. (Id.). In addition, blood tests indicated plaintiff underwent hormone therapy. (Id.). During these evaluations, plaintiff repeated her requests for continued hormone therapy, but also reiterated her concession that her prior hormone therapy was not prescribed by a physician. (Id.). She also routinely denied suicidal ideation, and did not demonstrate a propensity for self-harm. (See, e.g., Def. Ex. 5 (131-5) at 6-20). She did, however, demonstrate a tendency towards non-compliance with her prescribed court of treatment. (See, e.g., id.).

More specifically, on September 2, 2014, plaintiff told a psychologist that she was non-compliant with the medications prescribed for her mental health symptoms. (Id. at 6). She stated

these medications made her feel more depressed and that she wanted to try something else.  (Id.).

Plaintiff expressed a desire to resume hormone therapy.  (Id.).

Plaintiff was examined by a psychiatrist on September 10, 2014.  (Id. at 7).  Plaintiff expressed understanding that the GDRP would assess her request for hormone therapy.  (Id.).  She reported mood swings, although she was not violent, homicidal, or suicidal.  (Id.).  The psychiatrist discussed the "pros/cons of pharmacotherapy" with plaintiff and then prescribed Atarax.  (Id.).

On November 5, 2014, plaintiff again reported to a psychologist that she was non-compliant with her medications.  (Id. at 18).  Plaintiff denied any suicidal or homicidal ideation and did not appear to be at any greater risk of for violence than the average inmate.  (Id.).  The psychologist worked with plaintiff on developing coping skills.  (Id.).

A psychiatrist examined plaintiff on November 23, 2014.  (Id. at 20).  Plaintiff reported persistent gender dysphoria, but was dismissive of the various treatment options presented by the psychiatrist.  (Id.).  The psychiatrist noted that plaintiff demonstrated "entitlement" and that "any insight into his own contributions to his emotional health appears lost on him."  (Id.).  The psychiatrist prescribed Vistaril for plaintiff.  (Id.).

A psychologist examined plaintiff on December 2, 2014, and assessed her as follows:

Mr. Fox may be suffering from Gender Dysphoria. He does endorse the criteria of a strong desire to be of the other gender and a strong desire to be treated as the other gender for longer than six months. Mr. Fox also meets the criteria for Transvestic Disorder as he described recurrent and intense sexual arousal from cross-dressing manifested by fantasies and behaviors and the behaviors cause significant distress in important areas of functioning . . .

Mr. Fox will remain on the outpatient mental health case load to monitor his stability and treatment needs. Mr. Fox will be seen every 30-45 days, as per policy, and he indicated an understanding in how to self-refer, should he require services sooner. He will also be followed by the psychiatrist, since he is prescribed psychiatric medication.

(Id. at 15).

The GDRP reviewed plaintiff's case on December 2, 2014. (Futrelle Aff. (DE 153-13) ¶ 11). This review included a full review of plaintiff's medical and mental health records. (Id.). The GDRP also interviewed plaintiff. (Id.). After this thorough review, the GDRP unanimously recommended that plaintiff not resume hormone therapy. (Id.). Specifically, the GDRP determined:

> The review panel unanimously recommends inmate Fox should not be started on hormone therapy at this time. Inmate Fox has shown a pattern of instability and indecisiveness (e.g. starting and stopping psychiatric medication, being attracted to males and females, as well as children.) Inmate Fox was informed about the potential side effects of hormone therapy . . . Inmate Fox will be allotted time to digest and process the information presented to him today. He was encouraged to read the information and to create a list of questions, if any. It is recommended a Gender Dysphoria Review Panel follow up with further recommendations after the holidays.

(Def. Ex. B (DE 153-15) at 2).

Before the second panel convened, plaintiff incurred a disciplinary infraction at Harnett and was demoted to a higher custody level. (Futrelle Aff. (DE 153-13) ¶ 13). Accordingly, plaintiff was transferred to Maury Correctional Institution ("Maury") on December 17, 2014. (Byrd Aff. (DE 132 ¶ 10). That day, she submitted a request for mental health services, seeking counsel from a female therapist to discuss "transgender and abuse issues." (Id.). Plaintiff was evaluated by Futrelle[3] the next day. Futrelle assigned plaintiff to a mental health clinician and a psychiatrist. (Id.). He also made a recommendation that plaintiff be permitted to shower alone. (Id.). Finally, Futrelle decided to re-initiate the GDRP proceedings. (Futrelle Aff. (DE 153-13) ¶ 16).

---

[3] Futrelle has a Masters Degree in Psychology and is employed by DPS as a Psychological Program Manager. (Futrelle Aff. (DE 153-13) ¶¶ 3-4).

Byrd[4] also examined plaintiff on December 18, 2014. (Byrd Aff. (DE 132 ¶ 10). During this examination, plaintiff reported that she identified her gender as female.[5] (Id.). Plaintiff also stated that she had taken "steroids" to begin gender reassignment prior to incarceration. (Id.). Again, however, plaintiff reiterated these drugs were not prescribed by a physician. (Id.). Byrd's review of plaintiff's prior medical history revealed "a history of self-injurious behavior in the form of cutting, multiple suicide attempts, polysubstance abuse (including alcohol), sexual assault and rape, and a history of sexual acts with minors for which she was incarcerated." (Id.). The records did not reveal a history of chromosomal abnormalities, ambiguous genitalia, or hormonal abnormalities. (Id.). Because plaintiff had already been referred for mental health treatment and for review by the GDRP, Byrd did not enter any additional orders related to plaintiff's gender dysphoria. (Id.).

Byrd examined plaintiff again on January 2, 2015, after she was involved in an altercation with another inmate. (Id. ¶ 11). Plaintiff stated that she did not want to be placed in segregation, but also did not feel comfortable in the general population. (Id.). Plaintiff requested an appointment with a therapist. (Id.). Plaintiff also requested additional information about possible treatments for her transgender issues. (Id.). Byrd approved plaintiff's request to see a therapist, and noted the GDRP would further advise plaintiff regarding her treatment options. (Id.).

On June 27, 2015, plaintiff submitted a grievance stating "I am transgender and I'm diagnosed with gender identity dysphoria." (Daughety Aff. (DE 153-4) ¶ 6). Plaintiff also stated

---

[4] Byrd is physician licensed in the state of North Carolina who was employed by DPS during the time period relevant to plaintiff's complaint. (Byrd Aff. (DE 132) ¶ 2).

[5] During this examination, plaintiff also complained of injuries she sustained playing basketball. Moreover, plaintiff was examined by medical care providers on numerous occasions for conditions unrelated to her gender dysphoria. (Brown Aff. (DE 131) ¶¶ 10-22; Byrd Aff. (DE 131) ¶¶ 10-12, 15). In general, the court omits from its summary details of plaintiff's medical treatment unrelated to her gender dysphoria. However, the record clearly indicates that plaintiff received treatment for all of her medical complaints. (See, e.g., id.). Any assertion that defendants were deliberately indifferent to a medical condition other than gender dysphoria is belied by the record.

in her grievance that was "on hormones prior to prison." (Id.). Daughety[6] responded to the grievance. (Id.). First, Daughety reviewed plaintiff's medical records, and could find not documentation that plaintiff received hormone therapy from a licensed health care provider. (Id. ¶ 7). She then informed plaintiff of her findings and notified plaintiff that any further accommodation of her gender dysphoria would have to be addressed by the GDRP. (Def. Ex. A (DE 153-5)).

On June 29, 2015, plaintiff complained of bedwetting and requested adult diapers. Owens[7] reviewed plaintiff's chart and prescribed disposable underwear for 180 days. (Owens Aff. (DE 131) ¶ 14). Owens personally examined plaintiff on July 8, 2015. (Id. ¶ 15). Among other things, plaintiff renewed her request for hormone therapy. (Id.). Because the GDRP had already stated it would reconvene to assess to plaintiff's case, and because plaintiff was already receiving ongoing mental health treatment, Owens did not enter any new orders related to plaintiff's gender dysphoria. On July 15, 2015 altered plaintiff's prescription for adult diapers from extra-large to medium, and then renewed the prescription for another 180 days. (Id. ¶ 16).

In connection with her new GDRP proceedings, plaintiff was interviewed by a psychologist. (Futrelle Aff. (DE 153-13) ¶ 17). After this interview, the psychologist determined that plaintiff met the diagnostic criteria for Gender Dysphoria and Pedophilic Disorder. (Def. Ex. C. (DE 153-16) at 2).

On September 16, 2015, the GDRP reconsidered plaintiff's case. (Def. Ex. 4 (DE 131-4)). The GDRP gave plaintiff unlimited time to speak, during which she presented her personal history. (Daniels Aff. (DE 153-1) ¶ 10). The individual panel members also interviewed plaintiff. (Id.).

---

[6] Daughety is a Licensed Practical Nurse who is employed by DPS. (Daughety Aff. (DE 153-4) ¶ 2).

[7] Owens is physician licensed in the state of North Carolina who was employed by DPS during the time period relevant to plaintiff's complaint. (Owens Aff. (DE 131) ¶ 2).

During the interview process, plaintiff requested five accommodations: (1) three specific hormones; (2) bras; (3) panties; (4) make-up; and (5) to be searched as a female (i.e. custody staff using the backs of their hands during the search). (Id.). After considering plaintiff's presentation and the medical record, the GDRP reached the following conclusions:

> Available information suggests that Mr. Fox does meet the diagnostic criteria for Gender Dysphoria. He additionally meets criteria for Transvestic Disorder with autogynephilia, Pedophilia and Other Personality Disorder with antisocial and borderline traits.

> While recent-training has indicated that a "freeze frame policy" (making a decision to deny hormones simply because they have not been previously prescribed) cannot be considered a determining factor, the Committee believes it important to note that no evidence can be found to support that Mr. Fox was ever prescribed hormones by a physician. Careful review with possible input from legal representatives would seem prudent given that the current Gender Dysphoria policy does not address the specific situation in which an inmate has not been legally prescribed hormone therapy in the community.

> The Committee has reservations about recommending hormone therapy. Mr. Fox has a pattern of indecisiveness and inconsistency with regard to taking medical medications, starting/refusing psychiatric services and attending assigned programs/activities. Additional concerns exist with regard to multiple potential adverse effects associated with hormone treatment as outline in the literature including an increased rate of cancer, strokes, and osteoporosis . . .

> The Committee does not support female foundations garments (i.e. bras and panties) as these would present a security concern in an all-male facility. Concern exists that wearing these articles of clothing have been proven to sexually stimulate Mr. Fox in the past by his own admission.

> The Committee does not currently support a modification to the way Mr. Fox is searched.

(Def. Ex. 4 (DE 131-4) at 3-4).

B.      Facts Related to Plaintiff's First Amendment and RLUIPA Claims

In August, 2015, while she was incarcerated at Maury, plaintiff discussed her religious beliefs with Hackett.[8] (Hackett Aff. (DE 153-8) ¶ 4). During this conversation, plaintiff described

---

[8] Hackett is a Chaplain employed by DPS. (Hackett Aff. (DE 153-8) ¶ 2).

her faith as "witchcraft." (Id.). Hackett informed plaintiff that DPS did not recognize "witchcraft" as an approved faith. (Id. ¶ 5). However, DPS does recognize Wicca as an approved religion. (Def. Ex. B (DE 153-3) at 1). Wicca's basic beliefs are described as follows:

> Wiccans tend to find and worship the Sacred as found in nature, often personified as Mother Earth and Father Sky. Many different names for Deity are used, and individuals will often choose goddesses or gods whose stories are particularly inspiring. These Deities become the focus of personal devotions. Similarly, covens will use chosen Deity names that are often hold in secret by group members. Wiccans strongly deny any worship or belief in Satan, the Devil or similar entities. Wiccans practice "magic" as part of rituals and ceremonies, by which is meant the direction and use of "psychic energy", those natural and invisible forces which surround all living things.

(Id.).

Wiccans are permitted to possess the following items: (1) book of shadows (a personal record of rituals, ceremonies, and spiritual growth); (2) sacred cloth (to cover sacred items); (3) cauldron (Styrofoam bowl not to exceed 6 oz.); (4) talisman bag (which holds items of person significance); (5) tarot cards; (6) one set of runes; (7) wand; (8) athame (a picture of a ceremonial knife); and (9) a religious medallion. (Id. at 2-3). Wicca adherents typically engage in rituals and ceremonies individually using these religious items. (Hackett Aff. (DE 153-8) ¶ 9). Therefore, they generally do not require corporate worship services. (Id.). Likewise, Wiccans have no formal diet requirements. (Def. Ex. B (DE 153-3) at 1). However, DPS permits Wiccans to gather together and observe special days together, so long as the gatherings are led by an approved volunteer or under the supervision of a DPS chaplain. (Id.).

During the August, 2015, conversation, Hackett told plaintiff that DPS recognized the Wicca faith, and showed plaintiff the approved faith practices and items for corporate and personal worship for that religion. (Hacket Aff. (DE 153-8) ¶ 7). After being shown DPS's policies regarding Wicca,

plaintiff requested religious items that were not approved.[9] (Id.). Hackett declined to accommodate the request. (Id.).

Plaintiff made another request for religious accommodation later in August, 2015. (Id. ¶¶ 12-14). Specifically, plaintiff sought: (1) weekly corporate worship; (2) outdoor worship services; (3) and the authority to post an inmate outside the door to keep out those who might disrupt the worship service. (Id. ¶14). Hackett forwarded plaintiff's requests to DPS's Division of Prison Chaplaincy Services. (Id. ¶15). Before she received a reply, plaintiff was transferred from Maury to Lanesboro Correctional Institution ("Lanesboro"). (Id.).

More generally, DPS houses inmates according their custody level, and inmates from each unit have their own religious groups. (Id. ¶16). DPS prohibits inmates from different units from interacting with each other due to security concerns, such as inmates of differing custody levels passing contraband. (Id.).

At the time plaintiff made her request for religious accommodation, DPS permitted any recognized religion with at least ten adherents to engage in corporate worship. (Id. ¶18). Additional accommodations for corporate worship were permitted if a religious volunteer was available to supervise. (Id.). In sum, "corporate worship services were permissible for recognized religions even if a facility chaplain or community volunteer was unavailable so long as there was supervisory staff available and 'sufficient offender interest (10 or more designated faith group members)' and an inmate faith helper applied - and was approved - to assist with the facilitation of a religious service or program." (Id. ¶23) (quoting DPS Religious Services Policy)). Since the filing of plaintiff's complaint, this quorum requirement has been reduced to six. (Id.).

---

[9] Plaintiff fails to precisely identify the items Hackett denied her on this occasion. To the extent plaintiff identifies items she seeks for worship in her amended complaint, it appears they are already provided by DPS. (See Am. Compl. (DE 99) at 93-96).

In August, 2015, there were not a sufficient numbers of Wicca adherents at Maury to satisfy the quorum requirement. (Id. ¶ 25). Likewise, there was no community volunteer willing to oversee Wicca corporate worship services. (Id.). Plaintiff was transferred to Lanesboro on September 23, 2015. (Daughety Aff. (DE 153-4) ¶ 7). Plaintiff's complaint does not address any burden on her religious exercise after her transfer to Lanesboro.

## DISCUSSION

A.    Motion to Participate[10]

During the pendency of this case, plaintiff has been transferred to different institutions several times (DE 80, 90, 103, 107, 150, 160, 164). Plaintiff is now incarcerated at Lanesboro. See N.C. Dep't of Pub. Safety, Offender Pub. Info.; (DE 164). Lanesboro resides in the Western District of North Carolina. 28 U.S.C. § 113(c).

Because she is now incarcerated in the Western District, plaintiffs seeks to "participate in the WDNC Pro Se settlement program." (Mot. (DE 166) at 1). Specifically, she seeks "free legal assistance . . . regarding settlement in this case." (Id.). Despite the fact plaintiff is now incarcerated in the Western District, this court still retains jurisdiction over this case. Accordingly, the program mentioned by plaintiff is inapplicable. To the extent this filing could be construed as another motion seeking the appointment of counsel, that request is denied.

In addition, plaintiff contends that officials at Lanesboro are denying her access to the courts by limiting the provision of paper and envelopes. (Mot. (DE 166) at 2). Prisoners have a constitutional right to reasonable access to state and federal courts. See, e.g., Lewis v. Casey, 518 U.S. 343, 350–51 (1996); Ex parte Hull, 312 U.S. 546, 549 (1941); Pink v. Lester, 52 F.3d 73, 76 (4th Cir. 1995). To state a claim for denial of access to the courts, the prisoner must show that the

---

[10] Plaintiff filed an identical motion in Jasmaine v. Floyd, Case No. 5:17-CT-3023-FL ("3023"), (DE 48). The motion was denied. (Id. (DE 49)).

defendant's conduct caused the prisoner actual injury.  See Lewis, 518 U.S. at 351–57; Michau v. Charleston Cty., 434 F.3d 725, 728 (4th Cir. 2006); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996).  The actual injury requirement mandates that the prisoner "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded."  Lewis, 518 U.S. at 351, 353 (footnote omitted).

Here, plaintiff's prolific filing in both this case and 3023 belie any argument she has been denied access to this court or suffered any other actual injury.  Regardless, any such claim against prison officials at Lanesboro must be filed in the United States District Court for the Western District of North Carolina after plaintiff has exhausted her administrative remedies.  In sum, for the reasons stated above, any relief sought in plaintiff's motion to participate is DENIED.

B.      Summary Judgment

        1.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial.  Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Anderson, 477 U.S. at 250.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007). "When cross-motions for

summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

2.    Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment consist largely of argument and conclusory statements in support of her claims.  To the extent she proffers evidence in support of her motions, she does not precisely explain the relevance of this evidence.  To the extent plaintiff cites the record in support of her argument, her citations do not establish that she is entitled to judgment as a matter of law. In short, plaintiff has not met her burden as the moving party on summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (finding the party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact.); Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). Accordingly, the court denies plaintiff's motion for summary judgment (DE 143).

3.    Defendants' Motion for Summary Judgment

a.    Qualified Immunity

Defendants raise the affirmative defense of qualified immunity.  Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  For the reasons

discussed below, plaintiff has not demonstrated the violation of a constitutional right, and defendants are therefore entitled to qualified immunity.

        b.      Deliberate Indifference

The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." <u>Williams v. Benjamin</u>, 77 F.3d 756, 761 (1996). "In order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993) (internal quotation omitted). The first prong is objective – the prisoner must show that "the deprivation of [a] basic human need was <u>objectively</u> sufficiently serious." <u>Id.</u> (internal quotation omitted). In the medical context, a basic human need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008) (quoting <u>Henderson v. Sheahan</u>, 196 F.3d 839, 846 (7th Cir. 1999)).

The second prong is subjective – the prisoner must show that "<u>subjectively</u> the officials acted with a sufficiently culpable state of mind." <u>See Strickler</u>, 989 F.2d at 1379 (internal quotations omitted). The mental state for "deliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." <u>Farmer v. Brennan</u>, 511 U.S. 825, 835 (1994). "It requires that a prison official know of and disregard the objectively serious condition, medical need, or risk of harm." <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995); <u>see Farmer</u>, 511 U.S. at 837. A plaintiff therefore must establish the prison official's "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by [the official's] action or inaction." <u>Jackson v. Lightsey</u>, 775 F.3d 170, 178 (4th Cir. 2014) (citing <u>Farmer</u>, 511 U.S. at

837–39).  The subjective knowledge requirement can be proved "through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge . . . ."  Scinto v. Stansberry, 841 F.3d F.3d 219, 225–26 (4th Cir. 2016).  Additionally a plaintiff can establish deliberate indifference by showing "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it."  Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation omitted) (quoting Farmer, 511 U.S. at 842).

Deliberate indifference is thus "a particularly high bar to recovery."  Iko, 535 F.3d at 241.  For claims involving medical care, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).  Negligence or medical malpractice in diagnosis or treatment are not exceptional circumstances.  See id.; see also Estelle v. Gamble, 429 U.S. 97, 105–08 (1976).

As an initial matter, plaintiff names several defendants–Owens, Byrd, and Daughety–who had no authority to treat plaintiff's Gender Dysphoria under DPS policy.  Moreover, these defendants medically treated plaintiff to the extent they were authorized and properly referred any issues outside the scope of their authority.  Thus, plaintiff has failed to allege any deliberate indifference on the part of these defendants.  Regardless, even those defendants with the authority to determine plaintiff's course of treatment did not violate her constitutional rights.

The Fourth Circuit has published two opinions concerning the interaction of the Eighth Amendment and gender identity disorder.  See De'lonta v. Angelone, 330 F.3d 630 (4th Cir. 2003) ("De'lonta I"); De'lonta v. Johnson, 708 F.3d 520 (4th Cir. 2013) ("De'lonta II").  Both cases dealt

with the same prisoner. The prisoner had been previously diagnosed with gender identity disorder and was receiving estrogen therapy. However, at some point prior to De'lonta I, the Virginia Department of Corrections ceased providing estrogen therapy to the prisoner. This caused the prisoner to suffer nausea, uncontrollable itching, and depression. Most harmfully, she also "developed an uncontrollable urge to mutilate her genitals." 330 F.3d at 632. Under Farmer's objective prong, the Fourth Circuit held that the prisoner's "need for protection against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." Id. at 634. The court found that the allegations of denial of care based on a uniform policy, "rather than on a medical judgment concerning [the prisoner's] specific circumstances," sufficiently made out Farmer's subjective prong. Id. at 635.

Ten years later, the prisoner returned to the Fourth Circuit in De'lonta II. In the interim, the prisoner had received regular psychological counseling, hormone therapy, and been allowed to dress and live as a woman. 708 F.3d at 522. However, she still suffered the urge to self-mutilate, and requested sex reassignment surgery. Id. at 523. The Fourth Circuit again found that the prisoner's "need for protection against continued self-mutilation" constituted an objectively serious medical need. Id. at 525. The court also found Farmer's subjective prong satisfied because the relevant standards of care indicated "that sex reassignment surgery may be necessary for individuals who continue to present with severe GID after one year of hormone therapy and dressing as a woman." Id. Therefore the court found that "just because [the Department of Corrections] ha[s] provided [the prisoner] with some treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment." Id. at 526 (emphasis in the original). Accordingly, the court concluded that the prisoner adequately pled facts that satisfied the subjective prong. Id.

However, even after the De'lonta line of cases, there are no Supreme Court or Fourth Circuit cases finding an established right to a specific type of medical treatment (i.e., hormone therapy) for Gender Dysphoria. In fact, De'Lonta court emphasized that it was not suggesting a specific remedy if an inmate with Gender Dysphoria proved a constitutional violation. De'lonta II, 708 F.3d at 526 ("We wish to be clear about our holding. We hold only that De'lonta's Eighth Amendment claim is sufficiently plausible to survive screening pursuant to 28 U.S.C.A. § 1915A. We do not decide today the merits of De'lonta's claim. Nor, for that matter, do we mean to suggest what remedy De'lonta would be entitled to should she prevail."). Rather, the focus of the De'lonta courts was protecting the prisoner from self-harm and mutilation. De'Lonta I, 330 F.3d at 634; De'Lonta II, 708 F.3d at 525.

Applying the instant record to this precedent, defendants were not deliberately indifferent to plaintiff serious medical needs. Unlike De'Lonta, plaintiff was not prescribed hormone therapy from a licensed medical practitioner prior to incarceration. Nonetheless, DPS seriously considered plaintiff's assertion she suffered from Gender Dysphoria. DPS provided plaintiff extensive psychological treatment, and offered pharmacotherapy. During her psychological evaluations, plaintiff was not suicidal, and did not demonstrate a propensity for self harm.[11] After this thorough psychological evaluation, the GDRP convened two panels to review plaintiff's case. Plaintiff was interviewed during both panels. After reviewing the medical records, the GDRP provided individual reasons, specific to plaintiff, for denying her request for hormone therapy. Among other reasons, the GDRP denied plaintiff's request because she demonstrated "a pattern of indecisiveness and inconsistency with regard to taking medical medications, starting/refusing psychiatric services and

_____

[11] As noted, Byrd's review of plaintiff's prior medical history revealed "a history of self-injurious behavior." (Byrd Aff. (DE 132 ¶ 10). However, plaintiff did not demonstrate this behavior in prison. There is no evidence of record plaintiff intended to mutilate himself in prison.

attending assigned programs/activities." (Def. Ex. 4 (DE 131-4) at 3-4). This finding is supported by the medical record.

In sum, DPS addressed plaintiff's Gender Dysphoria by providing her with extensive psychological treatment and counseling. After providing this mental health treatment, it was determined plaintiff was not a good candidate for hormone therapy based on her personal characteristics. In this posture, plaintiff simply describes a disagreement with her medical care providers, which is insufficient to state a deliberate indifference claim. Wright, 766 F.2d at 849; see also Morris v. Fletcher, 311 F. Supp. 3d 824, 832 (W.D. Va. 2018) (distinguishing De'Lonta I& II and noting "ongoing evaluation and treatment of the whole range of Plaintiff's medical and mental health problems has been a constitutionally adequate response to Plaintiff's medical needs"); Morris v. Fletcher, No. 7:15CV00675, 2018 WL 1163465, at *16 (W.D. Va. Feb. 13, 2018) (dismissing deliberate indifference claim related to Gender Dysphoria where "mental health professionals have continued to assess, evaluate and treat Morris, [and] to date, none of them have recommended that Morris receive hormones as a treatment."), report and recommendation adopted, No. 7:15CV00675, 2018 WL 1158419 (W.D. Va. Mar. 5, 2018), appeal dismissed, No. 18-6329, 2018 WL 2272659 (4th Cir. Apr. 24, 2018).

Based on the foregoing, defendants are entitled to judgment as a matter of law on plaintiff's claim that they were deliberately indifferent to plaintiff's serious medical needs.

> b.    First Amendment and RLUIPA

Beginning with plaintiff's RLUIPA claim, RLUIPA provides, in part:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a).  "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  Cutter v. Wilkinson, 544 U.S. 709, 721 (2005).

Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens her exercise of her religion.  See 42 U.S.C. § 2000cc-2(b).  The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009).  A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, . . . or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand."  Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest."  Ozmint, 578 F.3d at 250.  "'RLUIPA adopts a . . . strict scrutiny' standard."  Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting and citing Lovelace, 472 F.3d at 198 n. 8).  Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted); Ozmint, 578 F.3d at 252 (quotations omitted).  "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any

institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190); see Holt v. Hobbs, 135 S. Ct. 853, 866 (2015).

As for the First Amendment, the Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The United States Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened her exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice her religion withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safely, 482 U.S. 78, 89–91 (1987).

In deciding whether a defendant's actions can be sustained as "reasonably related to legitimate penological interests," the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89–90. Claims pursuant to the First Amendment and RLUIPA are evaluated under the same factors, but First Amendment claims are subject to a less demanding standard of proof. See Lovelace, 472 F.3d at 199, n.8 ("RLUIPA adopts a 'more searching standard' of review than that used for parallel First Amendment claims, strict scrutiny instead of reasonableness.") (quoting Madison v. Ritter, 355 F.3d 310, 314-15 n.1 (4th Cir. 2003)).

The court first notes that plaintiff's RLUIPA claims appear moot. Although RLUIPA provides an avenue for an inmate to remove a substantial burden on her religious exercise through injunctive relief, it "does not authorize claims for official or individual capacity damages." Sossaman v. Texas, 563 U.S. 277, 288 (2011) (finding that RLUIPA does not authorize a private cause of action for money damages against prison personnel for action taken in their official capacity); Rendleman v. Rouse, 569 F.3d 182, 198 (4th Cir. 2009). Moreover, as is the case for claims under § 1983, a claim for injunctive or declaratory relief under RLUIPA is generally moot once a prisoner is transferred to another facility. See Rendleman, 569 F.3d at 186. As noted above, plaintiff is no longer housed at Maury.

The court acknowledges that an exception to the mootness doctrine exists for cases that are "capable of repetition, yet evading review." The "capable of repetition, yet evading review" doctrine "applies only in exceptional situations" where "two circumstances [are] simultaneously present: (1) the challenged action [is] in its duration too short to be fully litigated prior to a cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." Spencer v. Kemna, 523 U.S. 1, 17-18 (1998) (quotation omitted). Thus, a transfer to a separate prison facility moots an inmate's requests for injunctive relief, so long as the transfer prevents the inmate from encountering those same allegedly unconstitutional prison conditions that gave rise to her original grievances. Turner v. Clelland, No. 1:15CV947, 2016 WL 6997500, at *13 (M.D.N.C. Nov. 30, 2016) (citing West v. Grams, 607 Fed.Appx. 561, 566 (7th Cir. 2015)), report and recommendation adopted sub nom. Turner, Jr. v. Clelland, No. 1:15CV947, 2017 WL 913630 (M.D.N.C. Mar. 7, 2017). That "'is not the case, however, where the inmate challenges a system-wide policy that applies wherever the inmate is next sent until his release.'" Id. (quotation omitted). Here, plaintiff's complaint relates in large part to the fact that there were not enough fellow Wiccans at Maury to support corporate worship services.

Plaintiff's voluminous filings are silent as to whether she still faces those conditions at Lanesboro. Thus, plaintiff's RLUIPA claims are likely moot.

Regardless, plaintiff's RLUIPA and First Amendment claims fail because defendants did not substantially burden her religious exercise.[12] "[A]t a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice." Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007), abrogated on other grounds by Sossamon v. Texas, 563 U.S. 277 (2011). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. Living Water Church of God v. Charter Twp. of Meridian, 258 Fed. Appx. 729, 739 (6th Cir. 2007).

Although plaintiff's claims survived frivolity review, from the onset they have been rambling and disjointed. On summary judgment, plaintiff has failed to come forward with any evidence, other than her own conclusory statements, that prison officials impeded her religious exercise. On the contrary, DPS recognizes and accommodates the Wiccan faith. DPS permits Wiccan inmates an extensive list of items to accommodate their faith practices. Plaintiff's desire for additional items to be added to this list, without more, does not establish a substantial burden. See Utt v. Brown, No. 5:12-CT-3132-FL, 2015 WL 5714885, at *10 (E.D.N.C. Sept. 29, 2015) (finding DPS had not substantially burdened an inmate's practice of Wicca when the inmate "provided no facts or

_____

[12]   Failure to demonstrate a substantial burden dooms both plaintiff's RLUIPA and First Amendment Clause because RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States. Lovelace, 472 F.3d at 186. Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." Van Wyhe v. Reisch, 581 F.3d 639, 657–58 (8th Cir.2009) (citing Patel v. US. Bureau of Prisons, 515 F.3d 807, 813 (8th Cir.2008)).

evidence whatsoever—aside from his unreasoned say so-to establish that the loss of the remaining disputed items forced him to modify his behavior or violate his religious beliefs.").   Likewise, Wiccan inmates are permitted to participate in private and corporate worship, and DPS recognizes several Wiccan special days.  Similarly, DPS's requirement of a quorum or outside volunteers does not burden plaintiff's religious practice.  <u>Adkins v. Kaspar</u>, 393 F.3d 559, 571 (5th Cir. 2004) ("The requirement of an outside volunteer . . . does not place a substantial burden on [a plaintiff's] religious exercise"); <u>Tillman v. Allen</u>, 187 F. Supp. 3d 664, 675 (E.D. Va. 2016) (holding that plaintiff  "fails to demonstrate that his inability to participate in Wiccan services was a result of Defendant['s] policy or actions . . .The evidence demonstrates that no Wiccan group religious services were held . . . because there were not enough Wiccan offenders to constitute group meetings or services.").

Based on the foregoing, defendants are entitled to judgment as a matter of law on plaintiff's claim that they substantially burdened her religious exercise.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment (DE 143) and motion to participate (DE 166) are DENIED.  Defendants' motions for summary judgment (DE 128, 143) are ALLOWED.   Plaintiff's claims are DISMISSED with prejudice, and the clerk of court is DIRECTED to close the case.


SO ORDERED, this the 26th day of September, 2018.


LOUISE W. FLANAGAN
United States District Judge